```
              IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF OHIO
                         EASTERN DIVISION
```

Deborah Norah,                     :

       Plaintiff,              :

   v.                              :     Case No. 2:13-cv-981

                                   :     JUDGE GREGORY L. FROST
Commissioner of Social Security,         Magistrate Judge Kemp

       Defendant.              :


                       REPORT AND RECOMMENDATION

                      I.   Introduction

    Plaintiff, Deborah Norah, filed this action seeking review of a decision of the Commissioner of Social Security denying her applications for disability insurance benefits and supplemental security income.  Those applications were filed on June 11, 2010, and alleged that Plaintiff became disabled on May 26, 2010.

    After initial administrative denials of her applications, Plaintiff was given a videoconference hearing before an Administrative Law Judge on April 19, 2012.  In a decision dated April 27, 2012, the ALJ denied benefits.  That became the Commissioner's final decision on August 26, 2013, when the Appeals Council denied review.

    After Plaintiff filed this case, the Commissioner filed the administrative record on December 5, 2013.  Plaintiff filed her statement of specific errors on February 6, 2014, to which the Commissioner responded on March 12, 2014.  No reply brief has been filed, and the case is now ready to decide.

    II.   Plaintiff's Testimony at the Administrative Hearing

    Plaintiff, who was 48 years old at the time of the administrative hearings and left school in the tenth grade, testified as follows.  Her testimony appears at pages 38-66 of

the administrative record.

Plaintiff testified that she had problems with reading, spelling, and math. She could read basic newspaper articles but did not think she could write a letter. She could count change. She had worked at a McDonald's restaurant on two different occasions, as a server and as a cleaner, and had trouble with her change coming up short when she worked at the cash register. She was also a housekeeper at the Ohio State Medical Center, collecting laundry and trash. She was let go from that job because of absenteeism or tardiness, which she attributed to physical issues or medications.

According to Plaintiff, her treating physician advised her to stop working due to overall body pain. She wore braces on her wrists and knees. Plaintiff said that she had problems writing, picking up and holding objects, and lifting more than five pounds. It was difficult or impossible for her to wash her hair, do laundry, or tie her shoes. She could not carry bags at the grocery store. Additionally, her knees hurt all the time and she experienced neck pain and severe headaches. Plaintiff also testified to back spasms.

Plaintiff testified that she could stand for ten minutes at a time and walk half a block. She could sit for half an hour before needing to get up. She did not sleep well and suffered from constant depression. She had crying spells due to both pain and depression. The only occasions she would leave home were to go grocery shopping, to go to the doctor's office, or to check on her mother. She also went to physical therapy and did some light exercises at home. She did dishes but did not cook, and did laundry with the help of her daughter. She took medication for anxiety but did not receive psychiatric treatment.

### III.  The Medical Records

    The medical records in this case are found beginning on page 276 of the administrative record.  The pertinent records can be summarized as follows.  Because Plaintiff's claims do not particularly implicate her physical condition, the Court will focus on the records of the consultative examiners who expressed opinions as to her mental impairments, and on her school records, which also factor into the analysis of whether she satisfied the criteria of Section 12.05(C) of the Listing of Impairments.

    Dr. John L. Tilley, a psychologist, evaluated Plaintiff on September 10, 2008.  He conducted a diagnostic interview and also administered a number of tests.  Plaintiff's chief complaint was her nerves.  She told Dr. Tilley she dropped out of high school in the tenth grade and that she was an "academically deficient student" with difficulties in reading and mathematics.  She was held back after the first grade and had been enrolled in special education classes.  At the time of the interview, she was working part-time at McDonald's.  She had no obvious language deficiencies and her affect was stable and appropriate.  She reported some anxiety.  She scored fairly low on reading, numerical operations, and spelling tests, with a composite score for those three skills in the first percentile.  Her verbal IQ was measured at 69, her performance IQ at 83, and her full-scale IQ at 74.  Dr. Tilley found her general cognitive ability to be in the Borderline range, and he diagnosed Borderline Intellectual Functioning (as well as a depressive disorder).  He rated her GAF at 70 and found that her "cognitive limitations will not serve as a terminal barrier to future employability" but would limit her occupational options "to some degree."   (Tr. 277-85).

    Almost two years later, Dr. James Tanley performed a similar evaluation.  His report shows that Plaintiff attempted to obtain a GED numerous times but was unsuccessful.  He stated, based on

-3-

his interview, that her intellectual functioning "appear[ed] to be in the MR range" but such diagnosis would require corroboration from independent sources such as school records. Dr. Tanley also diagnosed a depressive disorder and rated Plaintiff's GAF at 55. (Tr. 307-09).

A state agency reviewer, Dr. Tishler, stated that the "[e]vidence does not establish the presence of the "C" criteria" under either section 12.04 or 12.05 of the Listing of Impairments. (Tr. 98). Dr. Orosz, also a state agency reviewer, appears also to have diagnosed borderline intellectual functioning and to have concluded that the Listings had not been met. (Tr. 106-19).

Plaintiff's junior high and high school records show that she passed all of her classes in grades seven, eight and nine, earning a GPA of 2.00 in seventh and eighth grades and 1.459 in grade nine. She was absent 33 days in grade seven, 16 days the next year, and 31.5 days in grade nine, also being tardy 35 times that year. There is nothing in the records stating that any of her courses during those three years were in special education, and no IEPs or other similar documents were submitted. (Tr. 262-66). Plaintiff also stated on her application for benefits that she did not attend special education classes. (Tr. 234).

IV. The Vocational Testimony

Dr. Bruce Walsh was the vocational expert in this case. His testimony appears at pages 66-69 of the administrative record.

Dr. Walsh testified that Plaintiff had worked as a fast food worker, which was a light, unskilled position, and as a hospital housekeeper. That latter job ws medium and unskilled.

Dr. Walsh was then asked some questions about a hypothetical person who could read at a seventh-grade level, do math at a second-grade level, and spell at a third-grade level. That person could work at the light exertional level but could do fine and

gross manipulation on a frequent basis, could not climb ladders, ropes or scaffolds, could only occasionally climb ramps and stairs, could frequently balance, and could occasionally stoop. Also, the person was limited to the performance of simple tasks without a fast production pace.  According to Dr. Walsh, someone with those restrictions could not perform any of Plaintiff's past relevant work.

In response to additional questioning, Dr. Walsh testified that such a person could perform unskilled light jobs such as cleaner, stock clerk, or laundry worker.  He also identified the number of such jobs in the local and state economies.  If the person had more severe limitations so that she could lift only ten pounds occasionally and could stand or walk for only two hours in a workday, that would preclude all but sedentary work. Dr. Walsh described such work as "problematic" due to the restrictions on handling and fingering.

V. The Administrative Law Judge's Decision

The Administrative Law Judge's decision appears at pages 16-28 of the administrative record.  The important findings in that decision are as follows.

The Administrative Law Judge found, first, that Plaintiff met the insured requirements for disability benefits through December 31, 2013.  Next, Plaintiff had not engaged in substantial gainful activity from May 26, 2010 forward.  As far as Plaintiff's impairments are concerned, the ALJ found that Plaintiff had severe impairments including fibromyalgia, anxiety disorder, depressive disorder, and borderline intellectual functioning.  The ALJ also found that these impairments did not, at any time, meet or equal the requirements of any section of the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1).

Moving to the next step of the sequential evaluation

process, the ALJ found that Plaintiff had the residual functional capacity to perform work at the light exertional level except she could never climb ladders, ropes, or scaffolds, could occasionally climb ramps and stairs, could frequently balance, could occasionally stoop, and could frequently perform fine and gross manipulation with her hands.  Also, she was limited to simple tasks that did not have a fast production pace.  The ALJ found that, with these restrictions, Plaintiff could not perform her past relevant work, but she could perform the jobs identified by Dr. Walsh - specifically cleaner, stock clerk, and laundry worker - and that such jobs existed in significant numbers in the local and state economies (2,300 and 15,500, respectively). Consequently, the ALJ concluded that Plaintiff was not entitled to benefits.

      VI.  <u>Plaintiff's Statement of Specific Errors</u>

In her statement of specific errors, Plaintiff raises these issues: (1) the ALJ erred by finding that Plaintiff suffered from borderline intellectual functioning and by not finding that she met the requirements of Section 12.05(C) of the Listing of Impairments; and (2) the ALJ erred by not obtaining an updated medical expert opinion as required by Social Security Ruling 96-6p.  The Court analyzes these claims under the following standard.

<u>Standard of Review.</u>  Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consolidated Edison Company v. NLRB</u>, 305 U.S. 197, 229 (1938)).  It is "'more than a mere scintilla.'" <u>Id</u>.  <u>LeMaster v. Weinberger</u>, 533 F.2d 337, 339 (6th

Cir. 1976). The Commissioner's findings of fact must be based upon the record as a whole. Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985); Houston v. Secretary, 736 F.2d 365, 366 (6th Cir. 1984); Fraley v. Secretary, 733 F.2d 437, 439-440 (6th Cir. 1984). In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" Beavers v. Secretary of Health, Education and Welfare, 577 F.2d 383, 387 (6th Cir. 1978) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)); Wages v. Secretary of Health and Human Services, 755 F.2d 495, 497 (6th Cir. 1985). Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence. Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983).

### A. Listing 12.05(C)

In support of the first specific error she has identified, Plaintiff argues that the ALJ should have found her disabled under Listing 12.05(C). Section 12.05(C) of the Listing of Impairments provides that a claimant is presumptively disabled if (1) the claimant scores between 60 and 70 on a valid IQ test, (2) has another significantly limiting impairment, and (3) meets certain diagnostic criteria for mental retardation, particularly the manifestation of deficits in adaptive functioning prior to age 22. According to Plaintiff, the IQ score of 69 obtained by Dr. Tilley satisfies the first criterion; her other mental and physical impairments, some of which the ALJ found to be severe, satisfy the second; and her school records demonstrate the third. She faults the ALJ for not using the lowest of her three IQ scores when determining whether she meets this Listing, and also for concluding that her school records did not demonstrate the required deficits in adaptive functioning prior to age 22.

The Commissioner appears to agree that Plaintiff had one qualifying IQ test score and also suffers from other severe impairments. The Commissioner argues, however, that the ALJ had a substantial basis for rejecting her assertion that she suffered from mental retardation, noting that she had never been diagnosed with mental retardation, that her treating mental health source, Dr. Ratliff, did not note any functional restrictions due to mental impairments, and that Dr. Tanley made no definitive diagnoses of mental retardation. The Commissioner also contends that there is no evidence in the record of any current deficits in adaptive functioning, and no evidence of such deficits prior to age 22, pointing out that her school records show average to somewhat below average academic performance, but nothing else in the way of issues with her adaptive functioning.

In his discussion of Section 12.05(C), the ALJ noted, first, the presence of a qualifying IQ score, so he did not err in his consideration of that portion of the record. See Tr. 21. He found, however, that "there is no evidence to support a finding that [Plaintiff] was limited in at least two of the listed areas [communication, self-care, home living, social and interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety] on or before she turned 22 years old." Id. He specifically relied on the lack of proof that Plaintiff was enrolled in special education classes, the fact that she functioned well enough academically to earn Cs and Ds in regular classes, the lack of any IQ scores prior to age 22, the diagnoses of borderline intellectual functioning, and the opinions of the state agency reviewers. Id.

It appears Plaintiff's primary argument is that "there is substantial evidence to demonstrate multiple functional academic deficiencies that can therefore be used to infer the plaintiff's impairments before age 22." See Plaintiff's Statement of Errors,

-8-

Doc. 13, at 5. But that is not the standard. "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." Buxton v. Halter, 246 F.3d 762, 772 (6th Cir. 2001). Rather, the issue is whether the Commissioner's findings are reasonably supported by the record, even if the same record might also support a different conclusion on the issue of disability.

    Here, the ALJ was clearly entitled to rely on the record as a whole in determining whether Plaintiff met the criteria listed in Section 12.05(C); in fact, it would have been error for him not to have done so. See Williams v. Astrue, 2008 WL 819271, *5 (S.D. Ohio March 25, 2008), quoting Loza v. Apfel, 219 F.3d 378, 393 (5th Cir. 2000). Apart from some issues with academic performance, there is nothing to suggest that Plaintiff had any deficits in adaptive functioning prior to age 22. The fact that she maintained employment with two different employers for many years and that she could "care for ... daily needs, ... shop for groceries, ... interact with friends and families, and ... engage in ... other daily activities" without being impacted by her below-average cognitive abilities is further evidence that she did not demonstrate such deficits either before or after age 22. See West v. Comm'r of Social Security, 240 Fed. Appx. 692, 698 (6th Cir. July 5, 2007). And as the Commissioner correctly points out, the Court of Appeals, in Hayes v. Comm'r of Social Security, 357 Fed. Appx. 672, 677 (6th Cir. Dec. 18, 2009), observed that "this Court has never held that poor academic performance, in and of itself, is sufficient to warrant a finding of onset of subaverage intellectual functioning before age twenty-two." In fact, in Hayes, the fact that the claimant was able to achieve passing marks when she attended class (failing to do so only when she was excessively absent) and the fact that there was no evidence beyond the claimant's own testimony that

her intellectual functioning affected her job performance were both cited as supporting the ALJ's decision that the claimant did not meet the criteria for disability under Section 12.05(C). The Court reaches the same conclusion here, and finds no error in the ALJ's determination that, even taking into account Plaintiff's one qualifying IQ score, she did not meet the diagnostic standards for mental retardation in a way that satisfies the Listing.

### B. Updated Medical Expert Opinion

Plaintiff's only other argument is that the ALJ should have obtained an updated medical expert opinion on the question of whether she qualified for benefits under Listing 12.05(C) after her academic records were submitted. She relies on SSR 96-6p and HALLEX 1-2-5-34 in support of this argument, and contends that the ALJ erred in not either submitting interrogatories to Dr. Tanley, or calling him as a witness, following the submission of those records. Plaintiff asserts that the ALJ "erred in using his lay opinion to make a determination regarding the plaintiff's mental impairments and aptitude." Statement of Errors, Doc. 13, at 6.

SSR 96-6p deals with the issue of medical equivalence. It clarifies or re-emphasizes the fact that "[a]n updated medical expert opinion must be obtained by the administrative law judge or the Appeals Council before a decision of disability based on medical equivalence can be made," and provides that obtaining such an opinion is mandatory "[w]hen additional medical evidence is received that in the opinion of the administrative law judge or the Appeals Council may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments."

HALLEX 1-2-5-34 also addresses when an ALJ must obtain an opinion from a medical expert, and states that such an opinion is

needed "[w]hen the ALJ is considering an finding that the claimant's impairment(s) medically equals a medical listing." It also indicates that an ALJ may obtain such an opinion when determining whether or not an impairment meets a listed impairment.

Here, Plaintiff does not argue that her impairment is the equivalent of the impairment described in Listing 12.05(C), but that she actually meets the Listing. By their terms, neither SSR 96-6p nor HALLEX 1-2-5-34 requires a medical opinion to be obtained in these circumstances. They do not supply the applicable rule of law here. Rather, the question raised by Plaintiff is whether the ALJ abused his discretion by not obtaining additional medical opinion evidence after the school records were obtained. As this Court stated in Smith v. Comm'r of Social Security, 2011 WL 1125031, *2 (S.D. Ohio March 24, 2011), aff'd 473 Fed. Appx. 443 (6th Cir. Apr. 2, 2012), a case cited in the Commissioner's memorandum, an ALJ's decision not to obtain a medical opinion "forms the basis for reversal or remand only when the record is not sufficiently clear for the ALJ to be able to make the necessary medical decisions." Thus, "where the ALJ simply cannot properly interpret the evidence ... the use of a medical expert may well be mandatory." Id.

For many of the reasons cited above, this is not a case where additional medical evidence was needed. The school records document nothing more than average academic achievement, without special education classes, at least through the eighth grade. There are no IQ test scores in those records, and Plaintiff's achievement test scores were not so far below the norm as to create some inference of deficits in adaptive functioning. Further, even academic deficits are not, standing alone, indicators of mental retardation prior to age 22. An expert opinion was not needed to interpret this particular set of records. Had they contained additional and significant evidence

of difficulties in other areas of adaptive functioning, such as self-care or social interaction, the ALJ might have (depending on the content and clarity of the records) been well-advised, if not required, to have them reviewed by a mental health professional, but that is not this case. The Court finds no error in the ALJ's failure to obtain an additional medical opinion.

## VII.  Recommended Decision

Based on the above discussion, it is recommended that the Plaintiff's statement of errors be overruled and that judgment be entered in favor of the defendant Commissioner of Social Security.

## VIII.  Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a de novo determination of those portions  of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).

                                        /s/ Terence P. Kemp

United States Magistrate Judge